William F. Christiana, S.
Gustav O. Jahns, a 74-year-old bachelor, sustained a cerebral thrombosis in his home during the early morning hours of May 23, 1957. As a result, his right arm and right leg became completely paralyzed. Shortly after noon on the same day, he executed a paper writing purporting to he his last will and testament. The instrument was prepared by an experienced attorney of unquestioned integrity although a stranger to testator’s acquaintance prior to the occasion on which it was drafted. The document was witnessed by such attorney, who supervised its execution, and by testator’s attending physician, both of whom testified that testator was completely lucid and rational at the time the paper writing was executed. By reason of his physical afflictions, Mr. Jahns found it necessary to sign the testament in question with his left hand. Directly following the execution of the alleged will, testator was removed to a local hospital where he sustained a second stroke and died on May 27, 1957. Thereafter, the paper writing was offered for probate in this court.
After several bequests, the propounded will divided testator’s residuary estate equally between two of his nephews, Donald Jahns and Paul Jahns and named them as his executors. Rudolph Jahns and Frederick Jahns, who are also nephews of the decedent, and Emily Jahns, a niece, all of whom have been *683 disinherited by the proposed will, filed the typical blanket objections to probate and demanded a jury trial. They alleged improper execution, lack of testamentary capacity and asserted that the testator was under restraint when the paper writing was signed and that the instrument was the product of fraud and undue influence. The objections were framed to cover seven specific questions. Questions 1 and 2 were related to due execution, questions 3 and 4 to testamentary capacity, question 5 to restraint and coercion and questions 6 and 7 to fraud and undue influence.
At the close of the testimony, proponents moved for a directed verdict on all seven questions. Decision on such motion was reserved and all seven questions were submitted to the jury.
In answer to questions 1 and 2, the jury found that the propounded will was properly executed. In response to questions 3 and 4, the jury concluded that testator lacked testamentary capacity and further found by their answers to inquiries numbered 5, 6 and 7 that the testator was under restraint when the instrument was drawn and that the paper writing offered for probate was procured by fraud and undue influence.
The case was well conducted by experienced and able counsel who exhibited during the course of the trial a commendable restraint in presenting the claims of their respective clients. Also, the points of law submitted by the attorneys for the contending parties have been concise and modulated in tone pointing solely to the issues involved. After a careful review of their content, and of the record, we reach the conclusions hereinafter contained.
The findings of the jury on questions 1 and 2, relating to due execution, were correct. In fact, no other verdict would have been warranted. The testimony on that issue was undisputed and a directed verdict would have been justified.
As to questions 3 and 4, relating to the issue of testamentary capacity, the situation is practically parallel. The evidence in favor of soundness of mind was overwhelming and virtually uncontested. Both subscribing witnesses to the propounded instrument presented strong and uncontradicted evidence that the testator fully comprehended the nature of his acts and was of sound and disposing mind at the time he signed the alleged will. The uncontroverted medical testimony merits meticulous attention and cannot be lightly brushed aside. Further, an attending nurse in the hospital, shortly following Mr. Jahns’ admission to that institution, indicated that his acts and conversations impressed her as being rational. To the same effect *684 was the testimony of a hospital orderly who assisted testator and who had known him personally for some 25 years. The only proof offered to the contrary was furnished by Boland Hunt and Pauline Hunt, his wife. While impressed with their sincerity, we are convinced that their observations are of little consequence on the question at issue. They testified that they saw Mr. Jahns when he was first admitted to the hospital directly after the will had been signed. They were persuaded that testator did not then speak clearly; that he appeared somewhat confused and that he mumbled his words. Even then, when interrogated by Mrs. Hunt as to his trouble, testator immediately responded and “ took his left hand and lifted his right hand— and struck his right leg ’ ’. Such actions would appear to disclose that, regardless of his bodily distress, testator’s mind was quite in touch with reality. In fact, the record indicates that over the period with which we are concerned, testator was in a serious physical state but was nevertheless completely rational.
It is our determination that the evidence produced by contestants as to mental incapacity is too inadequate and trivial to raise a question of fact justifying the submission of that issue to a jury. As was stated in Matter of Horton (272 App. Div. 646, 650): “ Some evidence was not enough. Evidence insufficient to convince a reasonable mind amounts to no evidence as a matter of law (Matter of Case, 214 N. Y. 199). (See, also, Blum v. Fresh Grown Preserve Corp., 292 N. Y. 241; Matter of Richards, 1 A D 2d 502.) It seems beyond dispute that our courts have fully embraced the maxim of law recited in the English case of Jewell v. Parr (13 C. B. 909, 916): “ when we say that there is no evidence to go to a jury, we do not mean that there is literally none, but that there is none which ought reasonably to satisfy a jury that the fact sought to be proved is established.”
Hence, the motion for a directed verdict in favor of the proponents as to questions 3 and 4, relating to testamentary capacity, is hereby granted and the objections incorporated in those questions are dismissed as a matter of law.
The response of the jury to questions 5, 6 and 7 finding that the paper writing offered for probate was obtained by coercion, fraud and undue influence poses a more difficult problem. The law is well settled. It is only its releveney to the presented facts which creates the mischief. Thus, no novel nor startling pronouncement will be inferred when it is stated that the burden of proof on fraud and undue influence is always with the contestants. (Matter of Kindberg, 207 N. Y. 220.) Such burden is *685 seldom easy to fulfill. Wrongful influence is usually perpetrated in a clandestine, stealthy and surreptitious fashion and direct evidence of the methods employed may not always be readily ascertained. Opportunity and motive can generally be discovered and shown, but both these factors, when combined, are never sufficient to furnish the case. (Cudney v. Cudney, 68 N. Y. 148; Matter of Richards, supra.) They are simply links in the evidentiary chain of events. In addition, the proof must establish that the influence was transmuted, applied and exerted on the testator to a point where his apparent desires were actually those of a substitute. The mesalliance between temptation and fulfillment must be consummated. Coupled with motive and opportunity, there is required an intervention inflicted on the testator, and intertwined with the instrument in question, enabling reasonable minds to conclude that the testamentary dispositions contained in the purported will were not those induced by testator’s volition. (Matter of Hawley, 44 Misc. 186; affd. 100 App. Div. 513; Matter of Connor, 230 App. Div. 163; Cudney v. Cudney, supra.)
The numerous authorities have precisely summarized the quantum of proof essential to sustain fraud and undue influence. They state in effect that the free agency or judgment of the testator must be destroyed. So too, it is to be observed that the degree and extent of the pressure exerted may vary with the strength or weakness of the mental capacity of the testator who is victimized. The amount of influence which would reduce and subdue a mentality affected with a natural disability or frailness, or by physical weakness or disease, might have no effect in attempting to misguide or mesmerize a mind possessed of full strength and vigor.
In view of the foregoing, we examine the record of the case at bar on the issues of fraud and undue influence construed in a light most favorable to the case of the contestants. On behalf of their position, we are assuming the following facts to be established:
a. For several days prior to the time he was first stricken, testator had been under medication and mild sedation. He was definitely in a serious physical condition when the purported will was executed.
b. Proponents contacted the attorney who drew the instrument in question and arranged his transportation to and from the home of testator where the attorney received his preliminary information. It may be added that while such attorney had never met testator prior to the event, it is a fair inference from *686 the evidence that testator knew the attorney by reputation and directed that he be called.
c. Such attorney had performed legal services for proponents on past occasions.
d. Proponents and members of their families were present at the home of the testator during the time the preliminary instructions were given to the attorney. Some of them were within hearing distance of testator’s bedroom where the preparatory conference with the attorney took place.
e. Proponents and members of their families, at the request of testator, assisted in obtaining certain addresses and in running down the family tree.
f. There was evidence of one direct suggestion, perhaps an intervention. After completing his preliminary conference, the attorney was about to leave the house, when Adele Jahns, a niece of decedent and one .of the legatees named in the will, asked the attorney if her uncle' had disposed of his car. The attorney answered in the negative and thereupon returned alone to the bedroom to ascertain testator’s desires on that item. Testator indicated he wished the car bequeathed to one Cedric Otis, a relative, which was done.
g. Immediately after execution of the instrument, testator directed that the paper writing be delivered to Donald Jahns to be placed “ in his box with his papers”. Donald Jahns apparently retained the instrument in his personal possession.
h. By order of his attending physician, and immediately after the will had been signed, testator was transported to the hospital in an ambulance, accompanied by Adele Jahns and Amelia Jahns, wife of one of proponents.
i. Prior to his removal to the hospital, testator requested that proponents notify Rudolph Jahns, one of the contestants, who lives in Brooklyn, of his condition. Proponents gave such notice but may be accused of being somewhat dilatory in carrying out testator’s direction.
j. There was conflicting evidence as to how friendly proponents had been with their uncle over the years. This is also true as to contestants.
The composite impact of this testimony, in our opinion, is indicative of some influence and creates issues of fact from which different inferences may be drawn. In other words, questions existed which should be submitted to a jury. A careful review of the record, however, leads to the conclusion that the evidence falls short of the degree required to sustain the burden of proof on the issues of fraud, undue influence and coercion. *687 This is particularly true when it so clearly appears that testator was in full possession of his mental faculties at the time when the paper writing was drawn and was obviously a person endowed with a strong, obstinate personality. So much so, that when counsel suggested that the purported will be signed with a mark, since testator’s right arm was completely paralyzed, Mr. Jahns insisted on signing his name to the instrument with his left hand and practiced writing his signature with his left hand, in the presence of his doctor and attorney, for a period of time prior to affixing his name to the document. During the process of such practice, testator joked about his physical condition and seemed to be in no apprehensive mood. While it may be true that proponents showed a willing disposition to take over testator’s affairs after he was physically disabled — very possibly in their own interests — it is equally evident that they appeared to do so at testator’s request or at least with his benediction. Someone must aid the stricken and it is not startling that kin nearest by way of distance should first offer comfort. Physically helpless as he was, it is difficult on the record to become satisfied that testator was a captive of proponents. From the thread of events, it appears that the making of the will was testator’s suggestion and that its provisions were the products of his independent thinking, even to the extent that he rejected some recommendations of counsel as to how the document was to be worded. Had testator displayed a less stable and inflexible mentality, or had the evidence demonstrated that his mind was impaired as a result of his physical condition, the particulars in controversy could very well have presented compulsions which may have controlled his volition and induced him to do what he otherwise would not have done. Under the given circumstances, however, we believe the language employed by the court in the Matter of Beneway (272 App. Div. 463, 468) is a caution to be heeded here. The court said: 11 The law looks with tender eyes on the will of an aged person and in the absence of the clearest and most convincing proof of invalidity the courts will uphold it.” After due deliberation, we feel constrained to set aside the findings of the jury on the questions of coercion, fraud and undue influence as against the weight of the evidence.
Proponents, nevertheless, urge that a directed verdict be granted on those issues. To comply would be to arrogate powers we doubt we possess. Contestants proved at least a prima facie case. A distinction should be drawn between cases where there is a failure to present a prima facie case and those where a *688 prima facie case is made but the burden of proof is not carried. In the former instance, a directed verdict is justified. (Blum v. Fresh Grown Preserves Corp., 292 N. Y. 241, supra). In the latter, we believe the rule was correctly pronounced in the course of the opinion in Playtown Prods. v. Ideal Toy Corp. (201 Misc. 911, 912) where the court said: “It would follow that where the evidence is sufficient to go to the jury, a verdict cannot be directed.”
Moreover, there is no longer substance to the contention that a verdict of a jury in the Surrogate’s Court is merely directive or advisory. In contested probate proceedings, the parties have a statutory right to a jury trial and where sufficient evidence is presented to justify submission of contested issues to a jury, their verdict is conclusive unless set aside by the court. (Matter of Barlow, 180 App. Div. 860.) If the verdict of a jury is set aside as against the weight of the evidence, the Surrogate has no alternative other than to direct a new trial. A directed verdict under such circumstances will not be protected with appellate approval. (Matter of Walther, 2 A D 2d 158, 159.)
The verdict of the jury on questions 5, 6 and 7 is hereby set aside as against the weight of the evidence and a new trial ordered solely on the objections embodied in questions 5, 6 and 7 relating to coercion, fraud and undue influence.
Submit decree on notice in accordance with this opinion.